Charles R. **FETTY, et al., Plaintiffs,**

v.

**PENSION BENEFIT GUARANTY CORPORATION, Defendant.**

**Civil Action No. 95–K–336.**

United States District Court,
D. Colorado.

Feb. 20, 1996.

Eugene Deikman, Denver, CO, Lee T. Judd, Andrew T. Brake, Denver, CO, for Plaintiffs.

Garth D. Wilson, Assistant General Counsel, Washington, DC, Linda A. Surbaugh, Assistant U.S. Attorney, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Three hundred former employees of a defunct steel corporation appeal from a decision of the Pension Benefit Guaranty Corporation (PBGC)[1] denying them early retirement benefits under the corporation's terminated retirement plan. The employees contend they were entitled to these benefits under the federal statutes and regulations governing the PBGC, and argue the PBGC's decision was arbitrary, capricious and contrary to law. Based on my review of the record, I

---

1. The PBGC is a government-owned corporation established under Title IV of the Employee Retirement Income Security Act of 1974 (ERISA) to administer the nation's pension plan termination insurance system. 29 U.S.C. § 1302. It is an entity "within the Department of Labor" whose Board of Directors is composed of the Secretaries of Labor, Treasury and Commerce. *Id.*

find PBGC examined the relevant data and articulated a rational connection between the facts presented and the decision made. Therefore, I affirm.

## I. *REGULATORY FRAMEWORK*

This case concerns the guaranteed benefit provisions of Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301–1461 (ERISA). The PBGC, whose Board of Directors consists of the (Secretaries of Labor, Treasury and Commerce) is a government-owned corporation charged with administering the nation's pension plan termination insurance program under Title IV of ERISA. *Id.,* § 1302. The purpose of Title IV is to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which it applies. *Id.*

When an underfunded pension plan terminates, PBGC takes over the assets of the plan as statutory trustee. 29 U.S.C. §§ 1341(c), 1342. PBGC then pays guaranteed benefits to plan participants and beneficiaries. *Id.,* §§ 1322, 1361. Subject to certain statutory limitations, the PBGC guarantees "all nonforfeitable benefits (other than benefits becoming nonforfeitable solely on account of the termination of a plan) under a single-employer plan which terminates at a time when [Title IV] applies to it." 29 U.S.C. § 1322(a). Under PBGC's guaranteed benefit regulation, a benefit "is considered to be nonforfeitable if on the date of termination of the plan, the participant ... has satisfied all of the conditions required of him under the provisions of the plan to establish entitlement to a benefit...." 29 C.F.R. § 2613.6(a).

## II. *FACTS AND PROCEDURAL HISTORY*

CF & I Steel Corporation ("Old CF & I") of Pueblo, Colorado established a retirement plan (the "Plan") to provide various types of retirement benefits to employees of the company and its subsidiaries. Under the Plan, participants were eligible for "Normal Retirement" (generally starting at age 65) with monthly benefits based on the number of years of continuous service. Alternatively, participants with sufficient years of continuous service could elect to receive a reduced early retirement benefit at age 60.

The Plan also provided certain types of unreduced early retirement benefits based on contingent events. Such benefits were conditioned upon the occurrence of a permanent shutdown of a facility, layoff, or physical disability, and a resulting break in continuous service. Depending on the facts, eligible participants could receive such pensions at age 55 or earlier. Section 5.06 of the Plan provided:

> *70/80 Retirement.* Any Participant who has not attained the age of sixty-two (62) years and who shall have had at least fifteen (15) years Continuous Service, and (i) shall have attained the age of fifty-five (55) years, and whose combined age and years of Continuous Service shall equal seventy (70) or more, or (ii) whose combined age and years of Continuous Service equal eighty (80) or more, and:
>
> (a) whose Continuous Service is broken by reason of a permanent shutdown of a plant, department or subdivision thereof, or by reason of a layoff or physical disability
>
> \*   \*   \*   \*   \*   \*
>
> shall be eligible to retire on or after October 31, 1985, and shall upon his retirement (hereinafter "70/80 retirement") be eligible for a pension....

R. at 291–92. Section 5.07 of the Plan provided:

> *Rule-of-65 Retirement.* Any Participant (i) who shall have had at least twenty (20) years of Continuous Service as of his last day worked, (ii) who has not attained the age of fifty-five (55) years, and (iii) whose combined age and years of Continuous Service shall equal sixty-five (65) or more but less than eighty (80), and
>
> (a) whose Continuous Service is broken by reason of a layoff or disability
>
> \*   \*   \*   \*   \*   \*
>
> shall be eligible to retire on or after October 31, 1985, and shall upon his Retire-

ment (hereinafter "Rule–of–65 retirement") be eligible for a pension. . . .

R. at 292.

Finally, the Plan provided a Deferred Vested Pension for participants who were employed 10 years (or in some cases 5 years) before a break in continuous service. R. at 292–93. The Deferred Vested Pension was a monthly benefit starting at age 65 or 62. Alternatively, a Deferred Vested participant with at least 15 years continuous service could elect to receive this benefit in a reduced amount at age 60. R. at 300.

On November 7, 1990, Old CF & I filed a petition under Chapter 11 of the Bankruptcy Code. *In re CF & I Fabricators of Utah, Inc.*, Case Nos. 90B–6721 to –6730 (Bankr. D.Utah). In March 1992, the PBGC determined the Plan was underfunded and should be involuntarily terminated pursuant to 29 U.S.C. § 1342. By agreement with the Plan administrator, the Plan was terminated effective March 19, 1992, and PBGC was appointed statutory trustee. *See id.*, §§ 1341(c), 1322, 1342, 1361.

Old CF & I continued to operate while in bankruptcy for nearly a year. On or about March 3, 1993, Old CF & I sold most of its assets to CF & I Steel, L.P. ("New CF & I"), an unrelated Oregon company, pursuant to a plan of reorganization confirmed by the bankruptcy court. On that date, many or all of the Employees were laid off by Old CF & I.[2]

Employees began filing applications with the PBGC in 1994 for 70/80 Retirement or Rule–of–65 Retirement under Old CF & I's terminated Plan. Counsel for Employees

and the PBGC exchanged a series of letters from January 1994 to December 1994,[3] culminating in the PBGC's December 23, 1994 initial determination that Employees were not entitled to the benefits sought. (R. 1438–53.) PBGC reasoned the benefits were not "nonforfeitable" (and, therefore, not guaranteed under PBGC's guaranteed benefit regulation) because the layoff triggering Employees' eligibility occurred one year after the Plan was terminated. R. at 1438–39. This action ensued.

### III. *ISSUE ON APPEAL*

Employees seek a declaratory judgment pursuant to Fed.R.Civ.P. 65 that the PBGC's denial was "plainly erroneous, arbitrary and capricious and contrary to the applicable statutes and the PBGC's own regulations." Pls.' Compl., ¶ 15. In a separate request for relief, Employees invoke the court's equitable powers and seek an order (1) requiring the PBGC to calculate, account and report to Employees the amount of monthly early retirement benefits owed each of them; (2) entering judgment in Employee's favor for damages in the amount of benefits lost; and (3) enjoining the PBGC from "acting in any manner inconsistent with the judgment of this court." *Id.*, ¶¶ 16–17.[4]

Employees argued at the administrative level and now on appeal that, with the exception of experiencing a "break in Continuous Service by reason of a layoff," they had satisfied all the conditions for 70/80 and Rule–of–65 Retirement benefits under the Plan before its March 19, 1992 termination date. Because post-termination "retirement" affects neither participants' eligibility for

---

**2.** As stated in oral argument, most of the laid off workers were hired by New CF & I at the same facility. *See, e.g.*, R. 1472, 1507 (benefits applications of A. Aguero and D. Alexander showing applicants presently employed at "CF & I L.P." in Pueblo).

**3.** These letters are reproduced and included in Volume IV of the Administrative Record. Informal letters stating PBGC's position regarding Employees' entitlement to benefits were written on March 3, 1994 (R. 1277–79) and July 1, 1994 (R. 1362–67).

**4.** Employees initially sought to have this lawsuit proceed as a separate and independent action

against the PBGC, subject both to discovery and traditional motions practice. *See* Pls.' Mot. for De Novo Review and to Conduct Discovery (filed Aug. 18, 1995). I denied the motion and determined Employees challenge to the PBGC's final agency action would be treated as an appeal and reviewed on the administrative record in accordance with the Administrative Procedures Act, 5 U.S.C. § 701 *et seq. See* Order, No. 95–K–336, slip op. at 3 (Nov. 2, 1996) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) and *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573–75 (10th Cir.1994)).

benefits under 29 C.F.R. § 2613.5(a)(3) nor the nonforfeitability of those benefits under § 2613.6(a), Employees maintained they were entitled to their 70/80 or Rule–of–65 benefits notwithstanding their post-termination "retirement."

The PBGC rejected Employees' efforts to equate the contractual term "layoff" with the regulatory term "retirement" and explained Employees' construction of § 2613 was contrary both to the plain language of the regulation and legislative intent. PBGC determined the occurrence of a "layoff" or similar break in continuous service was a substantive, rather than procedural, condition for eligibility under the Plan, and found the fact no "layoff" had occurred as of the Plan termination date fatal to Employees' claims. The issue on appeal is whether this determination was arbitrary, capricious or otherwise contrary to law.

### IV. STANDARD OF REVIEW

■ Because there is no obligation for applicants to exhaust administrative remedies before seeking review of an initial PBGC determination, *see* 29 C.F.R. § 2606.23(b), the December 23, 1994 letter constituted final agency action for the purposes of judicial review under the APA. Upon review, an agency's interpretation and application of its own regulation is entitled to substantial deference. *Renfro v. City of Emporia*, 948 F.2d 1529, 1537 (10th Cir.1991); *see Nachman Corp. v. PBGC*, 446 U.S. 359, 373–74, 100 S.Ct. 1723, 1732, 64 L.Ed.2d 354 (1980) (Court could not reject PBGC's construction of "completely unambiguous" definition of "nonforfeitability" in 29 C.F.R. § 2613.6(a) without careful examination of Title IV's legislative history). The interpretation will be upheld unless the agency (1) acted outside the scope of its authority; (2) failed to comply with prescribed procedures; or (3) the agency's action was otherwise arbitrary, capricious or an abuse of discretion. *American Petroleum Inst. v. EPA*, 540 F.2d 1023, 1029 (10th Cir.1976) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–17, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)). Only the third transgression is alleged in the instant case.

■ The duty of a court reviewing agency action under the "arbitrary or capricious" standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir.1994) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)). As long as the agency articulated a reasoned basis for its action and the action is supported by substantial evidence in the administrative record, it will be affirmed.[5]

### V. DISCUSSION

■ For the purposes of Employees' benefits applications, the following facts were undisputed: The Plan was terminated on March 19, 1992; Employees met the age and service requirements for 70/80 and Rule–of–65 Retirement benefits as of the Plan termination date; but Employees did not experience a "break in Continuous Service by reason of layoff" until March 3, 1993, one year after the Plan termination date. Employees

---

5. Employees assert at pp. 4–5 of their Reply that the PBGC's determination was "unwarranted by the facts to the extent that the facts are subject to trial *de novo*" under 5 U.S.C. § 706(2)(F). Plaintiffs misapprehend the distinction between review of formal, versus informal, agency determinations. Informal agency action must be set aside if it fails to meet statutory, procedural or constitution requirements or if it was "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." *Overton Park*, 401 U.S. at 413–14, 91 S.Ct. at 822 (construing § 706(2)(A)–(D), the "generally applicable" standards of review), *discussed in Olenhouse*, 42 F.3d at 1574 & n. 23). The standards of review at § 706(2)(E) and (F) apply only to review of formal agency action, i.e., decisions made on the record of an agency hearing provided for by statute. *Id.* at 414, 91 S.Ct. at 822. The determination at issue here was an informal agency action subject to review under § 706(2)(A)–(D). That does not mean that a determination by the PBGC unwarranted by the facts will survive review. To the contrary, informal agency action will be set aside as arbitrary if it is unsupported by "substantial evidence". *See Olenhouse* at 1574 (citing *Association of Data Processing v. Board of Governors*, 745 F.2d 677, 683 (D.C.Cir. 1984) (Scalia, J.)).

argued the timing of the layoffs had no effect on the nonforfeitability of benefits they claimed had vested before the termination date. "Retirement (by reason of a layoff)," like the administrative process of "applying" for benefits, was a procedural formality that triggered a participant's right to payment regardless of when it occurred. *See* Letter from Deikman to Thomas dated March 24, 1994 ("March 24 Letter") at 3–6 (R. at 1299–1302).

Employees relied on § 2613.5 of PBGC's guaranteed benefit regulation as well as PBGC's Operating Policy Manual to support their argument. March 24 Letter at 4–5 (R. at 1300–01). PBGC was properly unpersuaded. Section 2613.5 provides that procedural post-termination events such as "retirement," "application for the benefit," or "satisfaction of a waiting period" will not affect a participant's entitlement to benefits. 29 C.F.R. § 2613.5(a)(3). Similarly, § 2613.6(a) states that the fact these events occur after a plan has terminated will not affect the nonforfeitability of otherwise payable benefits. In a caveat dispositive of the issue on appeal, however, both provisions make clear that they only apply if all *substantive* conditions of entitlement—such as the "break in Continuous Service by reason of layoff" required for entitlement to 70/80 or Rule–of–65 benefits under the Plan here—were satisfied "before the date of plan termination."[6]

Employees' *ipse dixit* attempt to equate the "layoff" requirement under the Plan with the word "retirement" as it is used in guaranteed benefit regulation is a transparent effort to expunge the former as a condition of entitlement to 70/80 or Rule–of–65 benefits. Because Employees had not suffered a "break in Continuous Service by reason of layoff" as of the Plan termination date, they are not entitled to benefits under the terms of the Plan. Even assuming, for the sake of argument, that post-termination layoffs could

trigger entitlement to benefits under the Plan, the PBGC correctly determined those benefits would not be "nonforfeitable" under 29 C.F.R. § 2613.6(a).

I reject Employees' construction of 29 C.F.R. § 2613.5 and .6(a). I also reject Employees' other arguments on appeal. Specifically, I reject the Employees' suggestion at oral argument that Old CF & I and the PBGC conspired in their March 18, 1992 termination agreement to limit PBGC's liability for benefits under the Plan. Employees question the timing of PBGC's decision to terminate the Plan when it did. I agree we would create perverse incentives indeed if we permitted PBGC to solicit agreements with employers for the post-termination shutdown of their businesses either to "puff up" the business's value or to help PBGC avoid the payment of benefits that accrue on that later shut-down or layoff date. However, there simply is nothing in the record or in the Old CF & I/PBGC termination agreement to suggest that was the case here.

I conclude PBGC's Initial Determination dated December 23, 1994 denying Employees' applications for 70/80 and Rule–of–65 benefits under the Plan correctly interpreted the applicable law and was neither arbitrary nor capricious. Accordingly,

The agency's action is AFFIRMED and the appeal DISMISSED.

---

6. The Operating Policy Manual upon which Employees rely contains a similar caveat. It is the policy of the PBGC to protect a participant's entitlement to benefits notwithstanding the occurrence of a post-termination separation from employment, but only "if he or she meets *all other requirements for receipt of the benefit.*" Policy Statement of March 29, 1990 (quoted by Employees in March 24 Letter at pp. 5–6 (R. at 1301–02) (emphasis added).